**AMERICAN FLETCHER NATIONAL BANK AND TRUST COMPANY, and Elmer L. Winkler, Co-Executors of the Estate of Louis E. Winkler, Deceased**

v.

**The UNITED STATES.**

No. 171–76.

United States Court of Claims.

Dec. 12, 1979.

Richard E. Aikman, Indianapolis, Ind., attorney of record for plaintiffs. Baker & Daniels, Indianapolis, Ind., of counsel.

W. C. Rapp, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KUNZIG, Judge.

OPINION

PER CURIAM:

This case comes before the court on the plaintiffs' exceptions to the recommended

decision of Trial Judge Wood filed February 6, 1979. The suit is for recovery of estate taxes. The question before us is whether the plaintiffs carried the burden of showing that the assignment by the decedent of his interest in a group term life insurance policy within 3 years of his death was not made in contemplation of death, within the meaning of section 2035 of the Internal Revenue Code of 1954. The trial judge held that the plaintiff had not sustained that burden and that the Commissioner of Internal Revenue therefore properly had included the proceeds of that insurance in the decedent's gross estate.

Upon consideration of the briefs and after hearing oral argument, the court agrees with the trial judge's conclusion and adopts his recommended opinion and findings as the basis for its decision.[1]

We add the following comments:

Plaintiffs contend that this court's decision in *Landorf v. United States*, 408 F.2d 461, 187 Ct.Cl. 99 (1969), establishes the "principle of law" that "a long standing plan and pattern of substantial lifetime giving is itself evidence of life-related motives sufficient to remove all gifts within the plan from the provisions of Section 2035," and that under this principle they have overcome the statutory presumption that gifts made within 3 years of death were in contemplation of death. *Landorf* does not stand for that proposition. To the contrary, in *Landorf* we pointed out that "[t]he vagaries of each case must be closely examined . . . to determine whether a specific transfer was prompted by some death-oriented reason or by a life-motive." *Id.* 408 F.2d at 472, 187 Ct.Cl. at 118. We there concluded "on the basis of evidence which is largely circumstantial . . . that plain-tiffs have shown that life motives were the dominant reasons for the transfer" of a group term life insurance policy. *Id.* 408 F.2d at 473, 187 Ct.Cl. at 119. One "life-oriented fact" the court there considered "pertinent"—which is not present in this case—was that "[d]ecedent's transfer, in part, helped his wife to establish her estate planning. . . . The desire to aid a wife in her estate planning is an additional life-motive." *Id.* 408 F.2d at 473, 187 Ct.Cl. at 120.[2]

In sum, *Landorf* does not establish the broad legal rule that plaintiffs view it as announcing. Rather, it turned on its facts. The determination whether a particular transfer was in contemplation of death is a factual one. We cannot say that the trial judge erred in concluding that the facts in this case, although similar to those in *Landorf*, were sufficiently different to warrant a different result.

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge:

Plaintiffs, co-executors of the estate of Louis E. Winkler, deceased, sue to recover an asserted overpayment of federal estate taxes and assessed interest, in the total amount of $26,590.22, plus statutory interest.

Most of the alleged overpayment resulted from an assessment of additional estate taxes grounded upon the Internal Revenue Service's inclusion in the decedent's gross estate of the proceeds of a group term insurance policy covering the life of the decedent. The principal issue involved is whether the decedent's assignment of his

1. Although we have adopted the trial judge's findings of fact, we have not printed them because, to the extent necessary to our decision, they are set forth in the opinion.

2. Similarly, in *United States v. Wells*, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931), which plaintiffs also cite for their position, the Supreme Court recognized "the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condi-tion, . . . ." *Id.* at 119, 51 S.Ct. at 452. The Supreme Court there upheld the determination of this court that the executors had rebutted the presumption under the Internal Revenue Code as it then stood that gifts made within 2 years of death were in contemplation of death. The *Wells* decision, like *Landorf*, turns on the particular facts and did not announce the general principle that the plaintiffs ascribe to it.

group term insurance coverage to his grandchildren in 1969, within a year of his death at age 78 on September 11, 1970, was made "in contemplation of death", within the meaning of section 2035, Internal Revenue Code of 1954, as amended, 26 U.S.C. § 2035 (1970).[1] If, as plaintiffs contend, the assignment was not so made, the insurance benefits paid upon the decedent's death were improperly included in his gross estate.

Plaintiffs further contend that a deduction from the decedent's gross estate in the amount of $628.64, for expenses incurred in selling securities in order to obtain funds to pay death taxes, debts, and costs of administration has not been allowed, but is allowable for federal estate tax purposes, and that the expenses of prosecuting this action (in an amount not yet finally determined) are also allowable as a deduction from the decedent's gross estate. *See* Treas.Reg. §§ 20.2053–3(c)(2), (d)(1) (1970). Defendant has explicitly admitted that the first of these two contentions is valid, and it has failed to respond to the second.

In these circumstances, it is concluded that plaintiffs are entitled to recover with respect to claimed expense deductions from the decedent's gross estate, with the amount of recovery to be determined pursuant to Rule 131(c). For the reasons hereinafter appearing, however, it is concluded that plaintiffs are not entitled to recover

with respect to the "contemplation of death" issue.

## I

The decedent was born November 8, 1891. He passed away at his home September 11, 1970, at the age of 78. The immediate cause of death was an acute coronary occlusion due to, or as a consequence of, coronary atherosclerosis of some years' duration. The coronary occlusion occurred while the decedent was taking a shower preparatory to going to his office.

From at least 1960 to the date of his death, the decedent was president and chief executive officer of the Rock Island Refining Corporation (the Corporation). On June 14, 1961, the Corporation entered into a group term life insurance master policy contract (the Policy) with Massachusetts Mutual Life Insurance Company (Mass Mutual). The Corporation's employees (with some exceptions) were covered by the Policy. From June 14, 1961 to the date of his death, the decedent's life was continuously insured under the Policy; as evidence of such coverage, Mass Mutual issued to him Certificate No. 56.[2]

Pursuant to the terms of the Policy as in effect at the times here relevant, the decedent's personal life insurance coverage was $75,000; accidental death and dismemberment benefits of up to $75,000 were also provided by the Policy.[3] The Policy (and the decedent's certificate) had no paid-in,

---

1. At the time here relevant, section 2035 provided as follows:

"(a) General rule.

The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) * * * in contemplation of his death.

"(b) Application of general rule.

If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of

this section * * * but no such transfer * * * made before such 3-year period shall be treated as having been made in contemplation of death."

Under section 2035 as amended by the Tax Reform Act of 1976, Pub.L. 94–455, 90 Stat. 1520, 1848, gifts within 3 years of death are taxable to the estate without regard to the state of mind of the donor.

2. The decedent did not own any voting stock of the Corporation on or at any time after June 14, 1961. In 1969 and 1970, members of the decedent's family owned one-half of the voting stock of the Corporation.

3. In one narrow circumstance, the amount payable for accidental loss of life was more than $75,000.

loan, or cash surrender value.[4] The Policy was a contributory one, under the terms of which an insured employee was to pay part of the premiums. Throughout the period the decedent was insured under the Policy, all amounts due as premiums for his coverage not paid by the Corporation were paid by the decedent.

The Policy was by its terms subject to the laws of the State of Indiana. Effective August 18, 1969, Indiana law was amended so as clearly to allow the assignment of all incidents of ownership held by an insured under a group insurance policy. On September 12, 1969, the decedent executed an "Absolute Assignment" assigning all right, title and incidents of ownership (including the right to change the beneficiary) he had under the Policy (and Certificate No. 56) to "Doris Ann Winkler, Custodian for Peter Duke Evans, Venetia C. Evans, D. Michel Winkler, Philip L. Winkler, Eric D. Winkler, [and] Holly Ann Winkler." Doris Ann Winkler was one of the decedent's daughters. The six persons for whom she was named custodian were grandchildren of the decedent.[5] On September 12, 1969, the ages of those children ranged from 2 to 12 years. Doris Ann Winkler accepted the assignment September 12, 1969; the Corporation and Mass Mutual waived the Policy (and certificate) provision prohibiting assignment and consented to the assignment September 12 and December 12, 1969, respectively.

Despite his age, the decedent was to the time of his death an active, vigorous chief executive of the Corporation. He normally worked some 7 to 8 hours per day, Monday through Friday, and he often worked several hours on Saturdays and Sundays as well. He participated actively in both day-to-day operations of the Corporation and in its long-range planning projects. Some of the major refinery projects in which he was actively involved at the time of his death were of such a nature as to require considerable time to complete.

In the 3 years preceding his death, persons who saw the decedent on a regular basis observed no appreciable decline in his mental or physical condition. During that period he had no apparent health problems and he apparently did not consult a physician for any reason. He had no prior history of heart disease.[6] He seldom if ever missed work because of illness, and he spent little or no time away from work on vacation. On this record, it is fair to conclude that to the time of his coronary occlusion and death at age 78, the decedent's health seemed to be excellent.

The decedent was also clearly a very generous man. He made many and substantial gifts to his family (including his wife, his three children, his siblings, a niece, and his six grandchildren) during his lifetime. His gifts to members of his family as reported on federal gift tax returns for the years 1933–35, 1943, 1946, and 1950–70,[7] included gifts of stock in many companies, stock rights, interests in oil and gas leases, savings bonds, cash, notes, and some 15 life insurance policies on the decedent's life.[8] The said life insurance policies, given by the decedent to his three children in 1935, were ordinary life, 20-payment life, or single premium 5-year endowment policies. At the time of the decedent's death, he had assigned to others all policies of insurance in force on his life; except for the 1969 assignment here involved, all such assignments had been made in or before 1941.

---

4. The Policy provided for conversion to whole life insurance under certain circumstances.

5. Those six children had been the named beneficiaries of the decedent's coverage under the Policy prior to the assignment.

6. From his death certificate, it would appear that in September 1970 the decedent had coronary atherosclerosis of some years' duration.

7. The decedent's gift tax returns for the years 1968–70 reported 11 gifts; none of the reported gifts (of stock, cash, and notes) was challenged as having been made in contemplation of death, nor is any such gift so challenged now.

8. The decedent's gift tax return for 1969 did not reflect a taxable gift in consequence of his assignment of the Policy here involved, because the Policy had no cash, loan, or "dollar" value at the time of assignment.

The decedent also made many and substantial charitable contributions during his lifetime. His individual federal income tax returns for the years 1967, 1968, and 1969 each contain a 3½ page listing of such contributions, totaling, respectively, $23,113.85, $28,104.35, and $20,532.35. In addition his federal estate tax return reflects a charitable bequest of $125,871.35.

The decedent's total gross estate, as reported on his federal estate tax return, was $1,481,848.97, valued at date of death. Stocks and bonds represented $1,237,951.89 of this amount. The balance consisted of $108,970.80 in mortgages, notes and cash, $53,517.07 in jointly-owned property, $41,914.35 in insurance on the decedent's life,[9] $35,694.86 in annuities, and $3,800.00 in miscellaneous property.

The record discloses that the decedent was a rather reserved soft-spoken, if authoritative, man, who did not discuss his private affairs, including his reasons or motives for making gifts to his family, with others. The precise reason or reasons for his generosity nowhere appear in the record.

With specific reference to the assignment here in issue, that assignment was made within 30 days after a change in Indiana law so as clearly to permit such assignments. So far as the record shows, however, the decedent had never expressed to anyone any desire to assign such coverage prior to the said change in law, nor, following that change, did he ever inform anyone of his reason or reasons for making the assignment.[10] There is no affirmative evidence as to the decedent's motivation for assigning his coverage under the Policy.

## II

The intent of Congress in enacting section 2035 (as that provision was in effect in 1970) was to reach substitutes for testamentary disposition, and thus to prevent evasions of the estate tax. *United States v.*

*Wells*, 283 U.S. 102, 116–17, 51 S.Ct. 446, 75 L.Ed. 867 (1931); *see also Allen v. Trust Co. of Georgia*, 326 U.S. 630, 635, 66 S.Ct. 389, 90 L.Ed. 367 (1946). To facilitate effectuation of that intent, section 2035 included a presumption that a gift within 3 years of the donor's death was, "unless shown to the contrary", made in contemplation of death, and thus includible in his gross estate.

As this court has only recently observed (*Peters v. United States*, 572 F.2d 851, 853–54, 216 Ct.Cl. 134, 138–39 (1978)),

> * * * the statutory phrase "in contemplation of death" must be construed with this intent prominently in mind. *United States v. Wells*, 283 U.S. 102, 116–18, 51 S.Ct. 446, 75 L.Ed. 867 (1931). "Death is 'contemplated' within the meaning of the statutory presumption if the dominant motive for the transfer is the creation of a substitute for testamentary disposition designed to avoid the imposition of estate taxes." *Cleveland Trust Co. v. United States*, 421 F.2d 475, 478 (6th Cir.) *cert. denied*, 400 U.S. 819, 91 S.Ct. 35, 27 L.Ed. 46 (1970). Any transfer within 3 years of death is presumed by the statute to be in contemplation of death unless the taxpayer can prove that the transfer was made not in anticipation of and with the thought of death but for dominant "purposes associated with life." *United States v. Wells, supra*, 283 U.S. at 118, 51 S.Ct. 446.

The burden of proof is in principle no different for life insurance than for other property. *Landorf v. United States*, 408 F.2d 461, 187 Ct.Cl. 99 (1969). Nevertheless, because life insurance resembles a testamentary disposition so closely, the burden is heavier in the case of a transfer of life insurance than in transfers of other property. *Estate of Compton v. Comm'r*, 532 F.2d 1086, 1088 (6th Cir. 1976); *Berman v. United States*, 487 F.2d 70, 72 (5th Cir. 1973); see H.Rep. No. 2333, 77th Cong., 2d Sess. (1942) 57,

---

**9.** This policy had been assigned to a trust in 1939, with a trustee bank as beneficiary. The terms of the trust are not in the record.

**10.** The decedent never sought personal tax or estate planning advice from either his accountant or his attorney.

1942–2 Cum.Bull. 373, 417–18. In the case of term life insurance, which has no loan or cash surrender value and can be enjoyed only if the insured dies, the burden becomes heavier still. * * *

Plaintiffs contend that the decedent followed a pattern of distributing his property to family members during his lifetime; that such a pattern stems from life-related motives; and that where the decedent has followed such a pattern, a gift within the time-frame of section 2035(b) is in contemplation of death only if significant death-related motives distinguishing that gift from all others are established by the record. Emphasizing the history of the decedent's giving to members of his family, the state of his health at the time of the assignment of his group term coverage, the absence of any governmental contention that other gifts, in 1968, 1969, and 1970, were made in contemplation of death, and the assertedly controlling decision of this court in *Landorf v. United States*, 408 F.2d 461, 187 Ct.Cl. 99 (1969), plaintiffs urge that the assignment should be found not to have been made in contemplation of death. In plaintiffs' view, the *"type of property"* [emphasis not supplied] assigned by the decedent is wholly irrelevant.

In this case, as in a host of section 2035 cases which have preceded it, there "is no escape from the necessity of carefully scrutinizing the circumstances * * * to detect the dominant motive of the donor in the light of his bodily and mental condition * * *." *United States v. Wells, supra,* 283 U.S. at 119, 51 S.Ct. at 452. The task of dealing with the subjective considerations this scrutiny entails is not an easy one. On this record, however, it is concluded that plaintiffs have failed satisfactorily to meet their burden of proof.

In order to show, as to prevail plaintiffs must, "by a preponderance of the evidence,

that the transfer [here in question] was not made in contemplation of death", "[a]ffirmative evidence of motives associated with life must be presented." *Landorf v. United States, supra,* 408 F.2d at 472, 187 Ct.Cl. at 117; *see also Peters v. United States, supra; Estate of Ridgely v. United States,* 180 Ct.Cl. 1220, 1247–48 (1967); *First National Bank at Lubbock v. United States,* 463 F.2d 716, 719 (5th Cir. 1972). Although a transfer of a life insurance policy within 3 years of death may well not be in contemplation of death in many circumstances, "affirmative evidence to establish the existence of acceptable life motives" is a necessary factual predicate for a conclusion that such a transfer of a group term life insurance policy was not in contemplation of death. *Landorf v. United States, supra; see also Peters v. United States, supra; Estate of Garrett v. Commissioner,* 180 F.2d 955, 956–57 (2d Cir. 1950).[11]

Proof that a gift challenged as in contemplation of death was motivated by, and a continuation of, the decedent's long-standing policy of making liberal lifetime gifts to members of his family, especially where coupled with evidence of other life-related motives, will bring it "within the category of those * * * intended by the donor 'to accomplish some purpose desirable to him if he continues to live.'" *United States v. Wells, supra,* 283 U.S. at 119–20, 51 S.Ct. at 452; *see also Landorf v. United States, supra; Skall v. United States,* 355 F.Supp. 778 (N.D.Ohio 1972); *Estate of Johnson v. Commissioner,* 10 T.C. 680 (1948). Indeed, defendant's failure to urge that other gifts (of stock, cash, and notes) by the decedent to his children and grandchildren within the 3 years preceding his death are includible in his gross estate is undoubtedly attributable to its recognition of these and similar rulings.[12]

The problem here, however, is that plaintiffs have made no affirmative showing

---

11. As Judge Learned Hand phrased the thought, "A conveyance of property which the grantee can by no chance use until the grantor's death, will so commonly be in the main testamentary, that it is fair to infer that that was its preponderating, if not indeed its only, purpose, unless there be affirmative evidence

of other contributory motives." *Estate of Garrett v. Commissioner,* 180 F.2d 955, 956–57 (2d Cir. 1950).

12. For reasons appearing hereinafter, that failure is of no moment here.

that the assignment of the decedent's group term coverage was motivated by, a continuation of, or in any way even related to, his long-established practice of tangible generosity to members of his family. Their proof is, rather, essentially that the decedent was generous,[13] and in good health,[14] notwithstanding that he was 77 years old at the time of the assignment of his group term coverage. That showing is deemed an insufficient one.

To quote Judge Learned Hand again, " * * * it becomes plain on reflection that one motive may dispose [a decedent] to convey one kind of property, and another, another kind * * *." *Estate of Garrett v. Commissioner, supra,* 180 F.2d at 957. On this record, it cannot fairly be inferred that the decedent's compelling, dominant, motive for assigning his group term coverage was identical to, or even related to, his motive for making other gifts of property. *Id.; see also Peters v. United States, supra; First National Bank at Lubbock v. United States, supra.*

In this connection, the decedent's son testified that he believed the decedent's main purpose in making gifts to members of his family was to see the beneficiaries of his generosity "enjoy some of the fruits that he'd enjoyed from life." Accepting belief as fact, the assignment here to be scrutinized can scarcely have derived from that motivation; as in *Peters,* "the asset transferred here had no value at all so long as [the decedent] continued to live * * *",

but was of value to his grandchildren only after, and by virtue of, his death. Even considering the decedent's good health in conjunction with his evident and long-standing generosity, the evidence is insufficient to show that that assignment was motivated by, or even related to, the considerations which prompted the decedent to make other gifts.

Plaintiffs' reliance upon *Landorf v. United States, supra,* as calling for a contrary result is misplaced.

In *Landorf,* decided upon a stipulation of facts, the court, after considering the decedent's age and physical condition[15] at the time of his transfer of a group term life insurance policy to his wife, his assignment of other policies of insurance on his life to his wife and sons, his substantial gifts to his wife and one son in the years preceding his death, and the inferential fact that the decedent desired to aid his wife in planning her estate, held that "[u]nder these specific circumstances" the "requisite showing of significant life motives" had been made. *Id.* 408 F.2d at 472, 187 Ct.Cl. at 118.

In *Landorf,* the court was able to perceive from "these specific circumstances" that the transfer of the group term policy was simply part of the decedent's "life-motivated plan" to distribute his property during his lifetime. *Id.* 408 F.2d at 473, 187 Ct.Cl. at 119. On the facts of this case, however, there is no showing whatever that the assignment of the decedent's group term insurance coverage was part of a pre-

**13.** The decedent's extensive lifetime gifts of valuable property to members of his family at least helped them to become more or less "independently established with competencies of their own." *United States v. Wells,* 283 U.S. 102, 118, 51 S.Ct. at 452 (1931). The assignment in question, however, was of value only upon, and because of, the decedent's death. There can be no serious argument that the Policy's dismemberment benefits, *per se,* have any significance here.

**14.** Defendant urges that absent a government contention that at the time of the assignment the decedent expected to die within the near future, evidence of his good health is irrelevant. Although such evidence is irrelevant where it is clear that "the transfer of the policy was in contemplation of death" (*Peters v. United States,* 572 F.2d 851, 854, 216 Ct.Cl. 134, 139

(1978)), the decedent's "bodily and mental condition" prior to and at the time of the assignment are (to the extent shown by the record) appropriate factors for consideration here. *United States v. Wells, supra; Cleveland Trust Co. v. United States,* 421 F.2d 475, 483 (6th Cir. 1970); Treas.Reg. § 20.2035–1 (1970).

**15.** The decedent in *Landorf* was only 60 at the time of the transfer. Moreover, he had been periodically advised by his physician that he was in excellent health. The decedent in this case was 77 at the time of the assignment in question, and apparently had not seen a physician for some years. While advanced age is plainly not decisive of the nature of a transfer, it is a strong factor to be considered in ascertaining the motive (or motives) of the decedent in making it. *Estate of Ridgely v. United States,* 180 Ct.Cl. 1220, 1245 (1967).

existing plan to distribute his property during his lifetime, or that any other life-related motives at all contributed to its making. Taking all of the relevant facts (including the decedent's death at age 78, within a year following the assignment, with a gross estate, valued at date of death, of nearly $1,500,000) into consideration, such a perception is not possible here.

In light of the foregoing, it is concluded that plaintiffs have failed to establish a right to recover with respect to the "contemplation of death" issue, but are entitled to recover with respect to claimed expense deductions. Accordingly, judgment should be entered for plaintiffs, with the exact amount of recovery to be determined in further proceedings pursuant to Rule 131(c).

## CONCLUSION OF LAW

Upon the findings and foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are entitled to recover to the extent stated in the opinion, and not otherwise, and judgment is entered to that effect. The amount of recovery is reserved for further proceedings under Rule 131(c).